UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-v-<br><br>JUAN TAVERAS-DEAZA,<br><br>Defendant. | 25-cr-666 (SHS)<br><br>OPINION & ORDER |

SIDNEY H. STEIN, U.S. District Judge.

Defendant Juan Taveras-Deaza has moved to suppress evidence obtained by Drug Enforcement Administration ("DEA") agents from Taveras's apartment on November 20, 2025. (Dkt. No. 23.)  The Court finds that the DEA's original warrantless entry of Taveras's apartment was not justified by exigent circumstances and therefore violated the Fourth Amendment to the U.S. Constitution.  However, the Court will not exclude evidence obtained from the DEA's later search of Taveras's apartment because that search was conducted pursuant to a warrant supported by probable cause independent of the DEA's earlier unlawful entry and the DEA's application for the warrant was not motivated by the unlawful entry.

## I.   FACTS

The Court conducted a hearing on Taveras's motion on April 14, 2026, and heard the testimony of DEA Special Agent Crystal Garcia and DEA Special Agent Andres Velasquez and received exhibits into evidence.

Velasquez testified, and the Court credits, that on October 21, 2025, DEA agents observed Taveras at a "smoke shop" they were investigating, which the agents "knew was selling cut to drug traffickers" based on "prior arrests . . . that started from the smoke shop where [agents] discovered narcotics on" individuals arrested after leaving the shop.  (Tr. of Apr. 14, 2026 Hearing at 70:2–5, 70:10–14.)  Velazquez testified, and the Court credits, that agents had been investigating the smoke shop for "plus or minus a year" and were familiar with a pattern in which "[w]henever drug dealers want[ed] to go buy cut" at the shop, "the employees from the smoke shop would walk out, access [a] shed" adjacent to the shop, "grab the material that was to be purchased, and hand it over to the drug dealer that was buying the cut."  (Id. at 70:17, 70:21–71:1.)  Velasquez testified, and the Court credits, that agents saw Taveras "approach[] [the] shop" and an employee of the smoke shop then exit the shop, "access[] the shed" next to the shop, and "[come] out [of the shed] with a" "black plastic bag that had bundles in it."  (Id. at 73:16–20, 74:2–75:9.)  Velasquez further testified, and the Court credits, that agents saw

Taveras then exit the smoke shop carrying the black plastic bag containing bundles. (*Id.* at 74:2–8.)[1] Velasquez testified, and the Court credits, that agents followed Taveras from the smoke shop to a residential building at 3800 Putnam Avenue in the Bronx, where Velasquez saw Taveras enter apartment 2E while carrying the same black plastic bag containing bundles. (*Id.* 75:12–77:3.)

Velasquez testified that agents surveilled Taveras over the following month. (*Id.* at 77:20–23.) Velazquez's testimony and documentary evidence establish that, on November 18, agents installed a "pinhole camera" immediately opposite the door to apartment 2E, which enabled agents to observe people entering and exiting the apartment in real time. (*Id.* at 80:7–18, 81:11–17; Gov. Ex. 1.)

Velasquez testified that video from the pinhole camera outside apartment 2E during the late evening of November 19 and early morning of November 20 (which agents were monitoring) showed "individuals going into the apartment, and some of those individuals were walking out of the apartment with bags in their hands" that appeared to contain bundles. (Tr. of Apr. 14, 2026 Hearing at 86:2–14, 86:23–87:2.) Testimony from both Agent Velasquez and Agent Garcia, which the Court credits, establishes that Garcia and Velasquez separately entered the hallway outside apartment 2E on November 20 and each heard sounds "like if they are hitting something with a hammer" (*id.* at 26:10–16 (Garcia)) or "loud thumps[] similar to a sledgehammer" (*id.* at 78:17–79:19 (Velasquez)) consistent with the use of a drug press emanating from apartment 2E. At the April 14 hearing, the Government played an audio recording made by Agent Garcia of the hammering sounds emanating from the apartment. (Gov. Ex. 2; Tr. of Apr. 14, 2026 Hearing at 27:16–18, 28:22–29:4.) Velasquez testified that later on November 20, while watching a live video feed from the pinhole camera outside apartment 2E from his cell phone, Velasquez saw Taveras notice the pinhole camera while Taveras was in the hallway outside apartment 2E. (Tr. of Apr. 14, 2026 Hearing at 90:1–7.) Video footage in evidence shows Taveras beginning to enter apartment 2E before stopping to look closely at the camera apparatus for roughly sixty seconds, "fidgeting with it" (*id.* at 90:3–4), lifting his cell phone above the device in an apparent attempt to photograph or video the top of the apparatus, then walking toward the right of the frame, which was away from the door to apartment 2E. (Gov. Ex. 4D.)

Velasquez testified that, based on watching Taveras inspect the pinhole camera apparatus on the live video feed from the camera, Velasquez and the other agents concluded that Taveras had discovered their surveillance. (Tr. of Apr. 14, 2026 Hearing

---

[1] When the agents later searched the shed, they found a "plethora of cut." (Tr. of Apr. 14, 2026 Hearing at 77:4–17.)

2

at 92:11–21.) Velasquez further testified that, based on their belief that "[their] surveillance had been detected," the agents determined that it was likely that Taveras "was going to destroy evidence," including narcotics, that the agents believed was in the apartment. (*Id.*at 93:3–5.) Velasquez testified that, based on this determination, DEA agents "announced [themselves] before entering the apartment" by "knocking on the door [and] saying 'police'" (*id.* at 95:22–23, 96:12–13), "briefly . . . wait[ed] for a response" (*id.* at 97:5–6), then "when [the agents] got no response, [they] rammed the door" open by "[breaking] open the locking mechanism" (*id.* at 97:8–19) and entered the apartment (*id.* at 98:2–7). Velasquez testified that this entry occurred within approximately five minutes of Taveras inspecting the pinhole camera apparatus. (*Id.* at 121:7–12.) After they entered the apartment, the agents arrested Taveras and others inside the apartment (*id.* at 98:24–25, 100:4–13) and performed a protective sweep of the apartment (*id.* at 99:17–100:3).

Later that same day, the agents applied for and obtained a search warrant for apartment 2E signed by Magistrate Judge Katharine Parker. (*Id.* at 101:14–23.) After obtaining the warrant, the agents then entered and searched the apartment (*id.* at 101:2–9) and collected extensive evidence, including "several weapons, heroin and fentanyl and glassines" (*id.* at 102:1–4), and apparent narcotics milling equipment such as a "pressing machine" (*id.* at 102:8–17; Gov. Ex. 5) and "coffee grinders" (Tr. of Apr. 14, 2026 Hearing at 35:11–18; Gov. Ex. 6).

## II. APPLICABLE LAW

The Fourth Amendment to the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because the home is the 'first among equals' in the Fourth Amendment's eyes, warrantless searches of a private dwelling are 'presumptively unreasonable.'" *Alexander v. City of Syracuse*, 132 F.4th 129, 146–47 (2d Cir. 2025) (first quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013), then quoting *United States v. Simmons*, 661 F.3d 151, 156–57 (2d Cir. 2011)). In other words, "the Fourth Amendment has drawn a firm line at the entrance to the house" and, "[a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980).

### A. Probable Cause for a Warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause "is a fluid concept" turning "on the assessment of probabilities in particular factual contexts," and as such is not "readily, or even usefully, reduced to a neat set of

3

legal rules." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

In evaluating probable cause in any given case, a judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Gates*, 462 U.S at 238). "Due to this subjective standard, a reviewing court generally accords 'substantial deference to the finding of an issuing judicial officer that probable cause exists,' limiting [its] inquiry to whether the officer 'had a substantial basis' for his determination." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (quoting *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)).

## B. Exigent Circumstances

The government may overcome the presumption that a warrantless search of a home is unreasonable if it shows that one of the exceptions to the warrant requirement applies, such as the presence of exigent circumstances. *Alexander*, 132 F.4th at 147.

The exigent circumstances exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (cleaned up). "Intended for 'now or never' situations, the exception authorizes warrantless entries to, for example, 'render emergency assistance to an injured occupant,' 'protect an occupant from imminent injury,' 'prevent the imminent destruction of evidence,' or 'prevent a suspect's escape' when there is 'no time to secure a warrant.'" *Alexander*, 132 F.4th at 147 (quoting *Lange v. California*, 594 U.S. 295, 301–02 (2021)).

When officers claim—as here—that exigent circumstances justified their warrantless entry due to the perceived imminent destruction of evidence, "[t]he core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer[] to believe that there was an urgent need to . . . take action" without first securing a warrant in order to prevent evidence destruction. *Alexander*, 132 F.4th at 147 (quoting *Chamberlain ex rel. Chamberlain v. City of White Plains*, 960 F.3d 100, 106 (2d Cir. 2020)).

"If an officer invokes the exigent circumstances exception to justify a warrantless entry to search for and preserve evidence, the bar is high." *Id.* at 148. "The threatened destruction of evidence must be 'imminent'" and "the exigent circumstances exception typically applies when an officer has reason to believe evidence inside a private dwelling is being destroyed or removed in real time." *Id.* at 147 (emphasis omitted) (quoting *Lange*, 594 U.S. at 301).

4

## C.  Independent Source Doctrine

Even when an unlawful search or entry has occurred, evidence "subsequently acquired through an independent and lawful source" such as a warrant may be admitted pursuant to the independent source doctrine. *Murray v. United States*, 487 U.S. 533, 539 (1988).  "The two elements that must be satisfied to allow admission [of evidence] in such circumstances are:  (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993).

## III. APPLICATION

### A.  Exigent Circumstances

The Court finds the Government has failed to demonstrate that the exigent circumstances exception applies to the officers' initial warrantless entry into the apartment because the facts available to officers at the time did not support the conclusion that immediate action was necessary to prevent the imminent or ongoing destruction of evidence.

The U.S. Court of Appeals for the Second Circuit has found that exigent circumstances justified entry without a warrant in order to prevent the imminent destruction of evidence when, for example, agents "heard a faucet begin to run in the kitchen and drawers being opened and closed" in response to officers announcing that a co-resident had consented to a search of the house for cocaine, *United States v. Andino*, 768 F.3d 94, 96 (2d Cir. 2014); when, after a controlled buy, agents heard "the sounds of shuffling feet" in response to officers knocking and identifying themselves and other agents radioed that occupants were attempting to escape through a bathroom window, *United States v. MacDonald*, 916 F.2d 766, 768 (2d Cir. 1990) (*en banc*); when agents heard "agitated conversation" and "the sounds of much stirring about and the slamming of drawers or doors" in response to knock and officer identifying himself, *United States v. Farra*, 725 F.2d 197, 198 (2d Cir. 1984); and when agents heard commotion and sounds of a flushing toilet after a suspect slammed shut an apartment door when officers displayed their badges and shouted "police," *United States v. Gomez*, 633 F.2d 999, 1002, 1006 (2d Cir. 1980).  The Second Circuit has also noted that a suspect's furtive behavior after becoming aware of the presence of law enforcement, such as suddenly and forcefully attempting to slam shut a door immediately after seeing government agents, can "raise[] a legitimate concern that [the suspect] would attempt to destroy or discard the drugs that the agents had probable cause to believe were inside." *United States v. Moreno*, 701 F.3d 64, 74 (2d Cir. 2012).

5

No similar facts exist in this case suggesting that there was an actual risk of imminent destruction of evidence absent the officers' warrantless entry. The Government has presented evidence, including a video of Taveras inspecting the camera which the Court viewed in the course of the April 14 hearing (Gov. Ex. 4D), establishing simply that officers on the scene observed Taveras notice the pinhole camera apparatus and examine it before walking at a normal pace *away from* the door to the apartment that the DEA officers believed contained drugs. After examining the pinhole camera, Taveras did not rush into the apartment in a way that would suggest he intended to begin destroying evidence. As noted, he instead moved down the hall away from the apartment door after examining the pinhole camera at a normal pace. *Contra Moreno*, 701 F.3d at 74 (unusual or panicked behavior such as slamming a door after recognizing law enforcement suggestive of intent to destroy evidence immediately). Even when the officers approached the door to the apartment after seeing Taveras notice the camera apparatus, there is nothing in the record to indicate that the officers perceived any indicia—such as toilets flushing, water running, or any other commotion—that evidence inside the apartment was being destroyed in real time.

The Court finds that these facts would not have caused a reasonable, experienced officer present at the scene to conclude that immediate action was necessary to prevent the destruction of evidence of illegal drug activity in the apartment. The Court acknowledges the apparent ease with which narcotics can be destroyed, but the ease of evidence destruction alone does not give law enforcement a license to enter a private residence without a warrant any time a suspect in a drug investigation has noticed police surveillance. To surmount the "high bar" for warrantless entry of a home to prevent destruction of evidence, officers must perceive facts that could permit them reasonably to conclude that evidence destruction is either happening in real time or will imminently happen. *Alexander*, 132 F.4th at 148. No such facts existed here, and the officers' warrantless entry into the apartment therefore was not reasonable under the Fourth Amendment's exigent circumstances exception.

## B. Independent Source Doctrine

Despite the illegality of the officers' initial entry into the apartment, however, evidence from the later search that day of the apartment will not be suppressed because the later search of the apartment was conducted pursuant to a search warrant issued upon probable cause independent of the warrantless entry and the officers' decision to seek a warrant was not motivated by the prior unlawful entry.

*First*, the later search was conducted pursuant to a warrant issued by Magistrate Judge Parker supported by probable cause derived from sources independent of the illegal entry. (*See* Dkt. No. 24-1("Warrant App.").) As the warrant application

6

submitted to Judge Parker sets forth and as agents Velasquez and Garcia testified at the April 14 hearing, agents observed Taveras obtain a weighted plastic bag from a shed agents knew was used to store narcotics cutting agents, and agents saw Taveras take that bag to apartment 2E at 3800 Putnam Avenue in the Bronx. (*Id.* ¶¶ 5–9(d).)  Agents further observed Taveras and others at the apartment come and go from the apartment throughout the night preceding the warrant application with weighted bags. (*Id.* ¶ 9(e)–(h).)  The warrant application also included a declaration that agents had heard loud noises, including banging sounds indicative of narcotics milling activity, emanating from the apartment that day prior to the warrantless entry.  (*Id.* ¶ 9(i), 10.) All of these facts supported—and certainly provided a "substantial basis" for, *Raymonda*, 780 F.3d at 113—Judge Parker's determination that probable cause existed that evidence of a crime would be found inside the apartment.  None of these facts derived from the earlier warrantless entry, and the warrant application, which disclosed the warrantless entry, expressly noted that the government was not relying on anything observed by law enforcement during the earlier entry into the apartment. (*See* Dkt. No. 24-1 at 7 n.1).

*Second*, the Court finds that the agents' decision to seek the warrant was not prompted by information gleaned from the unlawful earlier entry.  As the Court has set forth, probable cause for the warrant to issue existed prior to the warrantless entry, and the agents thus had good reason to seek a warrant to search the apartment even absent the initial warrantless entry.  Importantly, Velasquez's testimony—which the Court credits—is that, before Taveras discovered the pinhole camera apparatus and thus even before the warrantless entry into the apartment, agents had discussed applying for a warrant.  (Tr. of Apr. 14, 2026 Hearing at 104:17–105:4.)  The Court therefore finds that the DEA agents' application for the search warrant was not motivated by information gleaned from the initial illegal entry.

Accordingly, pursuant to the independent source doctrine, evidence obtained in the search conducted pursuant to the warrant signed by Judge Parker will not be excluded on the basis of the agents' earlier unlawful entry. *Johnson*, 994 F.2d at 987.

## IV. CONCLUSION

This Court concludes that exigent circumstances did not justify the DEA's initial warrantless entry into Taveras's apartment.  However, the DEA agents' later search of the apartment was conducted pursuant to a warrant supported by probable cause derived from sources independent of the illegal entry, and the warrant application was not motivated by information obtained from the illegal entry.  Accordingly, evidence obtained in that search pursuant to the independent source doctrine need not be

excluded.  Taveras's motion to suppress evidence obtained from the DEA's search of his apartment on November 20, 2025, is denied.


Dated:  New York, New York
        April 29, 2026

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.

8